UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CASE NO.   1:17-CR-73 |
| | ) | |
| v. | ) | **SENTENCING MEMORANDUM** |
| | ) | |
| DAVID R. PAYNE | ) | |
| | ) | |

## <u>SENTENCING MEMORANDUM OF THE UNITED STATES</u>

NOW COMES the United States of America, by and through R. Andrew Murray, United States Attorney for the Western District of North Carolina, and submits this sentencing memorandum in response to the Defendant's various filings dated August 5, 2018, and August 9, 2018.

### <u>Introduction</u>

This case has been pending for a long time.   The parties have communicated frequently, and on a deep and technical level, with the intention of narrowing the issues that remain for the Court to resolve at the sentencing hearing.   In many respects, those efforts have been successful.   However, the Defendant's sentencing memorandum, along with its assorted attachments, makes clear that three issues—not including ultimate sentencing recommendations—are still unresolved.

The first unresolved issue relates to the scope and severity of the relevant conduct, and this comes as something of a surprise to the United States.   The Defendant's sentencing memorandum contains numerous false denials of relevant conduct.   Moreover, the Defendant repeatedly accuses his victim of wrongdoing—of both the negligent and criminal varieties—despite knowing that his accusations are incorrect.   These actions by the Defendant obligate the United States to correct the record.   The Defendant cannot falsely deny, or frivolously contest, relevant conduct and still obtain

1

the benefit of an acceptance of responsibility reduction. *See U.S.S.G.* § 3E1.1, Application Note 1(A). If the Defendant persists in these tactics at sentencing, he will have forfeited the adjustment.

The second unresolved issue relates to the proper calculation of the loss amount. This is an issue that the parties have long anticipated presenting to the Court, and it will require Court resolution. For reasons stated herein, the loss amount for guidelines purposes is $261,000. The Defendant's arguments to the contrary—including the ones made by his "expert," David Miller—are not particularly compelling, and they do nothing to change the analysis.

The third unresolved issue relates to First Bank, the restitution claimant. The Defendant does not believe that First Bank is entitled to an order of restitution, but this Court's precedents say otherwise. As the successor-in-interest to Bank of Asheville, First Bank is entitled to an order of restitution in the amount of $261,000.

The United States does not include a sentencing recommendation in this memorandum, because the particular recommendation of the United States will depend on how the Court resolves these various issues at the sentencing hearing. However, absent any breach by the Defendant, the United States is obligated by the Plea Agreement to recommend a sentence at the low end of the guideline range, for any guideline range that falls within Zone D of the sentencing table.

<u>Discussion</u>

**A.     Issue One:   The Scope of Relevant Conduct/The Defendant's False Denial of Same.**

The first issue relates to the scope of the relevant conduct. In his sentencing memorandum, the Defendant purports to contrast his "limited and isolated crime" with an "extensive and lengthy pattern of misconduct" by the victim, *see* Doc. 36 (Sentencing Memorandum) at 6-7, and claims that "many allegations" in the Bill of Indictment were "either groundless or inaccurate," *see* Doc. 36 at 8. The Defendant accuses the victim, Bank of Asheville, of a litany of crimes, Doc. 36 at 10-11, and

2

otherwise mischaracterizes various lawful actions taken by the bank, Doc. 36 at 9-10. Later, the Defendant claims that his misrepresentations in the Bank of Asheville loan application likely "had no impact" on the victim's decision to approve the loan, despite his plea of guilty to an offense that requires, as an element, that the Defendant made the misrepresentations for the purpose of influencing the actions of the bank. Doc. 36 at 16. The Defendant even goes so far as to suggest that the United States should have dismissed the Bill of Indictment, and that the United States wrongfully strong-armed the Defendant into a plea for an offense that he now seems to be claiming he did not really commit. Doc. 36 at 8.

The commentary to U.S.S.G. § 3E1.1 provides that, in order to earn a reduction for acceptance of responsibility, a defendant must truthfully admit the conduct underlying the offense of conviction and truthfully admit—or not falsely deny—any additional relevant conduct for which he is accountable. *See* U.S.S.G. § 3E1.1, Application Note 1(A). To be sure, the Defendant is not required to volunteer any relevant conduct beyond his offense of conviction. *Id.* He is free to remain silent with respect to such matters. However, he cannot refuse to admit conduct that is a part of the offense of conviction, and he cannot falsely deny—rather than simply decline to address—relevant conduct that falls outside of it. *Id.*

The Defendant's sentencing memorandum suggests that he is on track to do both. By affirmatively denying any relevant conduct beyond his statements on a single loan application, and by frivolously blaming his victim, the Defendant has placed relevant conduct in issue for the sentencing hearing. The Defendant has therefore obligated the United States to present evidence on the matter to the Court. *See* Doc. 19 (Plea Agreement) ¶ 8(j) (requiring the United States to "inform the Court . . . of all facts pertinent to the sentencing process"). The evidence will show that every fraud alleged in the Bill of Indictment is relevant conduct. Moreover, the evidence will show that the version of the offense conduct set forth by the Defendant in his memorandum is frivolous, and that any

3

categorical denial of additional relevant criminal behavior is false. Falsely denying, or frivolously contesting, relevant conduct that the Court determines to be true is conduct "inconsistent with acceptance of responsibility." *United States v. King*, Case No. 98-4228, 1998 U.S. App. LEXIS 31370, *3-4 (4th Cir. 1998). So, if the Defendant persists with presenting this false and frivolous victim-blaming narrative at sentencing, then the Defendant will have failed to accept responsibility for his offense, despite his plea of guilty.

### 1. Every Fraud Alleged in the Bill of Indictment is Relevant Conduct.

This case is about bank fraud, and bank fraud offenses are offenses for which "the offense level is determined largely on the basis of the total amount of harm or loss." *See* U.S.S.G. § 3D1.2(d). "Relevant conduct" is therefore defined to include all acts and omissions, whether made by the Defendant or by any uncharged co-conspirators, "that were part of the same course of conduct of common scheme or plan as the offense of conviction." *See* U.S.S.G. § 1B1.3(a)(2).

"Same course of conduct" and "common scheme or plan" are defined in Application Note 5 to § 1B1.3. On the one hand, two or more offenses constitute part of a "common scheme or plan" when they are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purposes, or similar *modus operandi*." U.S.S.G. § 1B1.3, Application Note 5(B)(i). On the other hand, offenses that are not a part of a common scheme or plan may still constitute part of the "same course of conduct" when they are "sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G. § 1B1.3, Application Note 5(B)(ii). Relevant factors include "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." *Id.* The nature of the offenses is also a consideration. *Id.*

The evidence summarized below shows that the series of bank fraud offenses described in the Bill of Indictment were part of a common scheme or plan <u>and</u> that they were products of the same

4

course of conduct. In particular, all of the frauds were part of the same scheme to "leverage" properties that the Defendant obtained from Joe Eblen, in order to create liquidity for the Defendant, without revealing the underlying encumbrances. Therefore, all are relevant conduct.

### 2. Summary of the Evidence as to Relevant Conduct.

#### a. The Inception of the Scheme

On or about December 22, 2008, the Defendant, acting through a wholly-owned entity titled Provision 08, LLC, executed a transfer agreement with Joe Eblen. *See* Ex. 1, Transfer Agreement. Pursuant to the terms of the transfer agreement, Eblen agreed to transfer to the Defendant three properties owned by Eblen and one property owned by a family partnership jointly controlled by Eblen and his wife. *Id.* The four properties that Eblen transferred to the Defendant are referred to herein as Lot 4, Tract 3, Lot 77, and Lot 82 (collectively, "the Properties"). Eblen signed on behalf of himself, his wife, and the family partnership, while the Defendant signed on behalf of Provision 08. *Id.* As consideration for the transfer of the properties, the Defendant agreed to transfer to Eblen and Eblen's heirs the sum of $4.38 million dollars. *Id.* The Defendant further agreed to commence installment payments on his debt within 60 days. *Id.*

Those payments were substantial. The Defendant agreed to pay $24,500 per month for the first seven years, and $31,308.92 per month for the following twenty-three years. *Id.* The Defendant further agreed to sign, or to cause to be signed, "springing deeds of trust" on the Properties, which would be recorded if the Defendant failed to make the required payments to Eblen and Eblen's heirs. *Id.* Pursuant to the terms of the Transfer Agreement, George Gabler, who was a CPA and an associate of the Defendant, would hold the "springing deeds of trust" in escrow for delivery to Eblen and/or the heirs of Eblen in the event of non-payment by the Defendant. *Id.*

The Defendant sought to use these "springing deeds of trust," rather than ordinary, contemporaneously recorded deeds of trust, because the Defendant intended to use the properties as

5

collateral for a series of loans to solve his liquidity crisis. It would be difficult to do that if such a substantial prior encumbrance was a matter of public record, rendering junior any subsequent bank liens on the Properties. This is not idle theorizing. It is the Defendant's own version of events, as captured in a later recorded conversation between the Defendant and the Eblen family attorney. *See* Ex. 2 – Transcript of Recorded Conversation between Andrew Klein and David Payne at 33.

In summary, the Defendant wanted to do the deal with Joe Eblen because he needed property that he could use as "leverage" for a series of loans. Ex. 2 at 33. At the time, the Defendant was Eblen's attorney, in addition to being counter-party to the transfer, so the Defendant discussed the deal with Eblen's entire family and obtained their approval. Ex. 2 at 33. Eblen's family was enthusiastic. At that point, Eblen's advanced age meant that his wife would be the recipient of most of the monthly payments, and Eblen's children thought that would be a suitable arrangement for her support. Ex. 2 at 33, 36-37. According to the Defendant, the arrangement was also appealing to Eblen himself, because Eblen thought—mistakenly—that the arrangement would allow him to avoid capital gains tax treatment.[1] *Id.*

Thus, at the outset of 2009, the Defendant had recently agreed to pay Joe Eblen and his heirs $4.38 million for the Properties, in a series of substantial monthly installments. The deal was a real estate transaction reduced to a writing signed by all parties. Ex. 1. To be sure, the Defendant hoped that Joe Eblen would not hold him to the payment terms, and he probably had good reason to feel that way, at least in the near-term. However, the Defendant knew that a legal obligation had been created, and he knew that it would be enforceable against him, if or when Eblen or his heirs chose to

---

[1]     This recorded representation by the Defendant is troubling. Nobody is required to pay capital gains tax on a piece of investment property until the capital gain is "realized," as it is when the property is transferred for consideration. If the Defendant was telling Attorney Klein the truth, and Joe Eblen really did tell the Defendant that he wanted to unload the Properties to avoid capital gains tax, it would have been the Defendant's obligation, as Eblen's attorney, to advise Eblen that the right way to avoid capital gains tax would be to KEEP the Properties, not to sell them to the Defendant for a promise of installment payments. Instead, the Defendant did the deal.

6

enforce it.   Nonetheless, the Defendant never made a single payment on the debt.

### b.    The First PCB Fraud

Around the same time he was negotiating with Eblen for the purchase of the Properties, the Defendant was having trouble securing a loan from Pisgah Community Bank ("PCB").   At the time, the Defendant was a fifty-percent owner of a company titled Power Development, LLC.   Power Development owned a commercial property located at 56 Ravenscroft Drive, Asheville, North Carolina, among other things.   The Ravenscroft property was subject to a mortgage held by Bank of Asheville, and the Defendant wanted to refinance, but he could not do so at Bank of Asheville because he was approaching his lending limit.   Therefore, the Defendant went to PCB.

On December 1, 2008, the Defendant provided a financial statement to PCB loan Officer David Smith, in which the Defendant listed real estate assets worth $835,000 and total liabilities of approximately $640,000, among other line items.   Ex. 3 – Email from Payne to Dave Smith.   The Defendant was hoping that the 56 Ravenscroft Drive property would be sufficient collateral for the loan he was requesting from PCB—a loan of approximately $735,000—and that the borrower entity, Defendant's company Shire Properties, LLC, could then buy out the Bank of Asheville mortgage, effectively refinancing the Ravenscroft property.   The requested loan amount would also leave a substantial sum available as cash flow for the Defendant's operations.

The loan approval process moved slowly, and there was some concern that the collateral Defendant had offered to support the loan was insufficient.   So, on January 6, 2009, the Defendant emailed the loan officer, David Smith, stating the following:

> Dave:
>
> My portfolio has changed, as I stated some time before Christmas when I spoke to you, I was waiting on property from Walnut Cove; I have received title to 4.2 million dollars worth of property.   This is unencumbered property and in the name of Provision 08, LLC, a company solely owned by me.   So, asset wise, I'm strong.   This represents around 13 acres of property within Walnut Cove, which by the way, is still

7

selling lots even in this economy.   I plan to either sell them outright or develop them.
I will forward independent appraisals to verify for your records.

Ex. 4 – January 6, 2009, Email to David Smith.   The Defendant was referring to the Properties that he had recently agreed to purchase from Eblen.

When the loan officer followed up with a question, perplexed that the Defendant had been able to acquire so much property "totally unencumbered," the Defendant misrepresented that the property was a gift, stating, "I had worked and earned Mr. Eblen a lot of money.   He gave me my first lot which is what I am using as additional collateral for this loan and then he gave me the additional properties recently."   Ex. 5 – January 6, 2009, Follow-Up.   The loan officer's subsequent presentation to the loan committee therefore included more than $4 million in additional real estate assets for the Defendant, with no corresponding increase to liabilities to reflect the more than $4 million that the Defendant owed to Eblen and his heirs as a purchase price debt.   Exhibit 6 – PCB $735k Loan Presentation.   The bank took a first lien deed of trust on Lot 4, one of the Properties the Defendant had acquired from Eblen, as collateral, in addition to a lien on the Ravenscroft property, and approved the loan on or about January 20, 2009.

The agents investigating this case interviewed David Smith, and he confirmed that he was not aware of the purchase price debt that the Defendant owed to Eblen, and that the information would have been material to the bank's decision.

### c.     The Defendant Mortgages Two of the Properties to His Now-Fiancée

On or about April 3, 2009, the Defendant used Lots 77 and 82, two more of the Properties he obtained from Eblen, to secure a $350,000 loan from Mountain Mortgage, Inc., a company run by Shelle Rogers, who is now the Defendant's fiancée.   Ex. 25 – Lot 77 and Lot 82 Deed of Trust to Mountain Mortgage.   That debt was outstanding throughout 2009.   On or about the same date, the Defendant also mortgaged Tract 3, another of the Properties he had obtained from Eblen, to

8

Mountain Mortgage in exchange for a loan of $237,738.97. Ex. 34 – Tract 3 Deed of Trust to Mountain Mortgage. No release or satisfaction of that debt was ever recorded. Thus, both of these debts to Mountain Mortgage were outstanding throughout the relevant period of time.

The Defendant claims that he and Shelle Rogers had no personal relationship during the relevant period of time, and that may well be true. However, it is indisputable that the Defendant encumbered Lots 77 and 82 and Tract 3 of the Properties, to the benefit of Shelle Rogers's company Mountain Mortgage, on or about April 3, 2009, and that the interests created by those transactions were recorded at around the same time. Exs. 25 and 34.

### d.     The MFBT Fraud

By May of 2009, the Defendant had therefore incurred new debts of well over $1 million by "leveraging" the Properties he obtained from Eblen, in addition to the $4.38 million purchase price debt. Nevertheless, the Defendant had more "leveraging" to do. That month, the Defendant approached Mountain First Bank & Trust ("MFBT") for a $250,000 loan, offering Tract 3, which was already encumbered, as collateral. The Defendant sought to borrow through his entity Provision 08, LLC, the same entity that held title to the Properties, and the Defendant acted as closing attorney for his own loan. The Defendant told MFBT that it would be in first position against the collateral, so on or about May 22, 2009, the same date that he closed the loan, the Defendant's office prepared, and Shelle Rogers executed, a document subordinating the prior $237,738.97 loan secured by the same piece of property. Ex. 26 – Subordination of Tract 3.[2]

During the application process for the MFBT loan, the Defendant provided a false "Statement

---

[2]     At the same time, the Defendant was securing an additional $200,000 in financing through Mountain Mortgage, secured by a new deed of trust on Lot 77, and subordinating the April 3, 2009, loan for $350,000 to that new interest. Ex. 27 – Lot 77 New Money; Ex. 28 – Lot 77 New Money Subordination Agreement. Again, the Defendant's office prepared, and Shelle Rogers executed, the subordination agreement. Ex. 28. This $200,000 interest remained on the books, unmodified, throughout the remainder of the events discussed herein.

9

of Financial Position" to MFBT.  Ex. 7 – MFBT Statement of Financial Position.  The financial statement was substantially similar to the one that the Defendant emailed to David Smith, the loan officer at PCB, on December 1, 2008, with a couple of exceptions.  The Defendant now included a $4.2 million asset for "Provision 08, LLC" under "Investments"—clearly meant to denote the value of the Properties obtained from Eblen.  Ex. 7 at 2.  However, there was no corresponding increase to the Defendant's liabilities for the purchase price debt associated with the Properties.  *Id.* Moreover, the financial statement was dated January 1, 2009, which would have been before the several transactions outlined above, and the Defendant conveniently omitted to mention the more than $1 million in additional debt he had incurred on the Properties since that time.

In another point of distinction, the financial statement that the Defendant gave to MFBT did include a reference, in the line item for "Investments" held by "Provision 08," to a note that appeared later in the document.  Ex. 7 at 2.  However, rather than clear things up, the note doubled down.   It provided, "David R. Payne is the managing member with placement rights of and full control of 100% of the membership interest in Provision 08, LLC, which owns approximately 13.0 acres of property located within the subdivision known as Walnut Cove, a private Cliff's community.  The appraised fair market value of this un-encumbered property is 4,200,000.00."  Ex. 7 at 3 (emphasis added).

The financial information that the Defendant provided to MFBT, including his explanatory note, was clearly false.  At the time he applied for the MFBT loan, the Defendant knew that the Properties were collectively encumbered in excess of $1 million by his prior borrowing activity alone.  Furthermore, whether or not it was an "encumbrance," the Defendant also knew that he owed a substantial purchase price debt that was not reflected in the information he submitted to the bank. When interviewed by the agents investigating this case, the MFBT loan officer, Neil Hollifield, confirmed that knowledge of the millions of dollars in additional indebtedness not disclosed by the Defendant would have been material to the loan approval decision.

10

In a telling turn of events, when the MFBT loan later became distressed, and the bank sought an updated financial statement, the Defendant submitted one. It was dated September 30, 2009, and prepared by his accountant, George Gabler. Ex. 8 – September 30, 2009, SFP. This time, the financial statement did net out the purchase price debt, as well as some portion of the Defendant's notes payable to banks and secured by liens on the Properties. Ex. 8 at 6. The net value of Provision 08's assets changed from the more than $4 million that the Defendant had previously represented to the bank to just over $300,000, a nearly $4 million drop. This is further confirmation that the Defendant well knew that the purchase price debt, as well as the prior encumbrances, were enforceable legal obligations. He just chose not to disclose them up front.

### e. The Second PCB Fraud

On or about June 22, 2009, acting through his law firm, David R. Payne, PA, the Defendant obtained a $50k term loan and a $50k line of credit from PCB to finance his new law office. The loan was secured by a lien on the assets of the law firm David R. Payne, PA, and by the liens previously placed on 56 Ravenscroft Drive and Lot 4 of the Properties in connection with the January 20, 2009, loan from PCB to the Defendant. PCB made the loan based on the same information provided by the Defendant in connection with the January transaction. PCB knew, of course, about the $735,000 debt associated with the January loan, but Payne neglected to mention the approximately $1 million in additional debt he had incurred since that time in the Mountain Mortgage and MFBT transactions referenced above. He also again neglected to mention, of course, the purchase price debt associated with the Transfer Agreement through which he obtained title to the Properties.

Shortly after obtaining this additional extension of credit from PCB, the Defendant encumbered Lot 82 of the Properties—one of the two lots securing the $350,000 debt to Shelle Rogers—with an additional $100,000 loan to the Defendant from a pair of hard-money lenders, referred to in the Bill of Indictment as J.P. and K.J. The hard-money lenders' interest was junior to

11

that of Shelle Rogers, and it was recorded with a Deed of Trust that specified that it was a second position lien.

### f.    The Offense of Conviction

That leads us to the offense of conviction.    The Defendant's characterization of the facts and circumstances of the offense of conviction is false, to the point that it has required him to frivolously disregard documents that plainly contradict his representations to the Court.    As context, it is important to note that, by August of 2009, the Defendant had incurred the following relevant debts associated with his "leveraging" of the Properties held by Provision 08:

- A $4.38 million debt to Joe Eblen and his heirs, representing the purchase price of the Properties;
- A $735,000 debt to PCB, secured in part by a first position deed of trust on Lot 4 of the Properties;
- A $350,000 debt to Shelle Rogers, secured initially by first position deeds of trust on Lots 77 and 82 of the Properties;
- A $200,000 debt to Shelle Rogers, secured by a deed of trust on Lot 77 that subordinated the above;
- A $237,738.97 debt to Shelle Rogers, secured initially by a first position deed of trust on Tract 3 of the Properties;
- A $250,000 debt to MFBT, secured by a deed of trust on Tract 3 of the Properties that subordinated the above;
- A $100,000 follow-on debt to PCB, secured by the same collateral as the $735,000 debt; and
- A $100,000 debt to J.P. and K.J., secured by a second lien on Lot 82 of the Properties.

This reckoning excludes debts relating to, for example, the hypothecation of collateral to support other borrowers.[3]    Using these figures, in total, between acquiring the Properties on or about December 22, 2008, and applying for the loan at issue in August 2009, the Defendant encumbered the Properties to the tune of approximately $6,352,739, if one includes the purchase price debt, or

---

[3]    Payne did hypothecate at least one of the lots as collateral for at least one third-party loan, encumbering the lot in the amount of approximately $242,000.    However, that loan was primarily a part of a different course of conduct not directly at issue in this case.

12

approximately $1,972,739, if one excludes the purchase price debt. When given the opportunity to do so by the Bank of Asheville, the Defendant would disclose almost none of it.

### (i). Loan Details

When the Defendant approached Bank of Asheville for a loan in August of 2009, he already had an established banking history at that institution. The Defendant's various corporate entities, some held jointly with his father and/or Joe Eblen, had repeatedly sought financing from Bank of Asheville in connection with the Defendant's real estate development projects. The Defendant knew that he would be unable to pay off those pre-existing loans as they came due, and he wanted to refinance his debt while also securing some additional cash flow for his operations. So, as he had all year, the Defendant decided that he would "leverage" the Properties to accomplish his financial goals.

As set forth in the Factual Basis, on or about August 27, 2009, the Defendant, acting through his entity Provision 08—the same entity that held title to the Properties—obtained a loan from Bank of Asheville in the amount of $522,000.[4] During the application process, bank staff asked the Defendant to complete a Loan Application and Information Sheet ("LAIS"). Ex. 22 – LAIS. The Defendant completed the LAIS on or about August 12, 2009. *Id.* On the LAIS, the Defendant indicated "no" when asked whether any business assets of Provision 08 had been pledged as collateral for loans or supplier agreements. *Id.* at 1. The Defendant admits that was plainly false.

The Defendant made other misrepresentations on the LAIS, as well, including failing to disclose his other business entities, such as Shire Properties, LLC. Ex. 22 at 1-2. That omission would make it more difficult for a title searcher to find records of deeds of trust involving that entity, such as the ones filed in connection with the $735,000 PCB loan that partially encumbered one of the Properties held by Provision 08. Moreover, in the "Business Debt Chart" field, the Defendant

---

[4] The loan was initially approved for $457,000, and the parties moved up the dollar amount to $522,000 during a second-round approval process.

disclosed only Provision 08's $350,000 debt to Shelle Rogers, without disclosing the accompanying security interest encumbering Lot 82 of the Properties. *Id.* at 2. He failed to disclose any other business debts, including, for example, the $4.38 million purchase price debt for the Properties, owed by Provision 08 to Eblen and his heirs, and the numerous other short-term loans Provision 08 had taken out and not repaid. *Id.* Nevertheless, the Defendant certified that he—as the guarantor of the loan—was submitting a current financial statement. *Id.* at 3.

Throughout the loan application and approval process, Bank of Asheville made clear that the loan was contingent on the bank holding a first position lien on Lot 82, which the Defendant was offering as collateral. *See, e.g.*, Ex. 23 – Loan Commitment Letter from BoA; Ex. 9 – Credit Analysis Memorandum. Unfortunately, at the time, both Shelle Rogers (through Mountain Mortgage) and the hard-money lenders J.P. and K.J. had prior recorded interests in Lot 82. The Defendant was aware of those prior encumbrances, and the Defendant was the closing attorney for his own loan, so he thought he could fix it. The Defendant has communicated to the government, and it may well be true, that he intended to place Bank of Asheville in first position during loan closing by paying a $70,000 subordination fee to Shelle Rogers out of the loan proceeds, which would, in his mind, make Bank of Asheville the senior lienholder, because the J.P./K.J. deed of trust included a statement that it was a "second position" deed of trust.

There is some evidence that the Bank of Asheville loan officer with whom the Defendant was working, John Hamrick, either knew or could have known that prior recorded interests existed before the loan closed. When interviewed by the government, Hamrick expressed that he did not know about any such interests. However, the Defendant has produced email correspondence in which a member of his law firm sent a pre-closing preliminary title insurance binder to the attention of Hamrick and Hamrick's assistant. The preliminary title insurance policy included exceptions to coverage for both of the prior-recoded deeds of trust. Thus, a document notating the prior

14

encumbrances was available to Hamrick and his staff. It is therefore possible that Hamrick knew about the prior encumbrances, but it is also possible that Hamrick was not in the habit of personally reviewing certain types of correspondence sent to his office's attention, particularly when it related solely to the duties of the closing attorney.

In any event, there is no evidence that the bank's loan review committee—the people who actually approved the loan—knew about the prior encumbrances. The Credit Analysis Memorandum provided to them by Hamrick made clear that Bank of Asheville would be in first position. Ex. 9. Moreover, the HUD-1 settlement statement that David Payne prepared for the bank's loan file— which was certified true and accurate by David Payne as the closing attorney—did not disclose any subordination fee payable to Shelle Rogers, as it should have, if there was going to be one. Ex. 24 – HUD-1 Settlement Statement at 2. Finally, there is no evidence that Hamrick—or anybody else at Bank of Asheville—knew the extent of the Defendant's other undisclosed liabilities at the time he applied for the loan, which were considerable. Again, the Defendant has pleaded guilty to misrepresenting those liabilities.

Regardless of whether Hamrick knew or could have known that the bank was not in first leading up to the closing, it is indisputable that Bank of Asheville expected to be in first position when the closing was finished. That is not how things played out. The Defendant, as the closing attorney, did cut a check to Shelle Rogers for $70,000 on August 28, 2009, drawn from the loan proceeds that had been disbursed to the Defendant's lawyer trust account for closing purposes. Doc. 36-4; Doc. 38-27. However, the Defendant did not prepare a release of the Shelle Rogers lien until on or about May 26, 2010, which was after Bank of Asheville confronted him for failing to put them in first position. Doc. 38-13. Moreover, the Defendant was wrong about the legal impact of the "second position" language in the hard-money lenders' deed of trust. Taken together, that meant that Bank of Asheville was in third position—not first position—until May 26, 2010. After that, it was in second

15

position. It would never be in first position, which it had required as a closing condition.

In January of 2011, the FDIC closed Bank of Asheville. Several months after that, the hard-money lenders who were then in first position on Lot 82 sold the property in a foreclosure sale that left no money for anybody else. Bank of Asheville could not have participated, anyway, because it no longer existed. The disposition of the collateral therefore did nothing to redress the Bank of Asheville losses.

In his memorandum, the Defendant appears to absolve himself of any responsibility for Bank of Asheville's diminished collateral position, and to blame the outcome entirely on his victim. That story is not consistent with the facts. Confronted with those facts, the Defendant will doubtless try to shift the blame again. He may argue that Bank of Asheville should have confirmed its own lien position, even though Defendant was the closing attorney tasked with doing just that. Or, he may argue that it was incumbent upon Shelle Rogers—and not upon him—to record the release of her interest contemporaneous with the closing of the loan. But that is ridiculous, given the Defendant's past practices. Every time one of the Defendant's deals with Shelle Rogers needed to be subordinated, the Defendant's office prepared and filed the subordination agreement, while Shelle Rogers executed it. *See, e.g.*, Exs. 26 and 28. This instance was no different, when the Defendant and Ms. Rogers finally got around to it. Doc. 38-13. If the Defendant argues at sentencing that he had no responsibility, as the closing attorney, to ensure that the bank would be in the post-closing position that it had made a precondition of the loan, he will be frivolously contesting relevant conduct.

The final relevant conduct issue, with respect to the Bank of Asheville loan, relates to payment procedures. The Defendant's memorandum is littered with accusations of misconduct against Bank of Asheville relating to its collection of loan payments. Those accusations are frivolous, and they will be addressed in detail below.

          **(ii).** **Fact-Checking the Defendant's Version of His Own**

### Conduct with Respect to the Loan Approval and Payment Process.

The Defendant calls his false statements and omissions on the LAIS a "limited and isolated crime," contrasting those false statements and omissions with an "extensive and lengthy pattern of misconduct" by the victim. Doc. 36 at 6-7. It should be clear by now that there was nothing "limited" or "isolated" about the Defendant's false statements and omissions in connection with the Bank of Asheville loan. It was just the final act in a months-long, plainly intentional course of conduct. First, the Defendant acquired the Properties from Joe Eblen with the express intention of "leveraging" them, and he hid the associated purchase price debt with a "springing deed of trust" arrangement in order to more effectively accomplish his goals. Then, the Defendant did exactly what he planned to do.

Along the way, the Defendant compounded the fraud, neglecting, each time he approached a new lender, to mention the additional encumbrances he had placed upon the Properties through his dealings with lenders past. Frequently, his prior misrepresentations and omissions were of the very same type at issue here, such as when the Defendant hid prior encumbrances on the Properties, as well as the associated debts, from MFBT. It is difficult to reckon how the Defendant can admit that such conduct was criminal in one instance, but not in another. In summary, the context paints a picture of Defendant's offense conduct that is inconsistent with his contention that it was limited to "a single loan application." Doc. 36 at 9.

### (iii). Fact-Checking the Defendant's Version of the Victim's Conduct with Respect to the Loan Approval and Payment Process.

The other half of the Defendant's core comparison is dependent on false statements of fact, as well. The Defendant contrasts his alleged one-time slip-up with an "extensive and lengthy pattern of misconduct" by the victim, *see* Doc. 36 at 6-7, and the bulk of Defendant's memorandum is an

17

extended exercise in victim blaming. To be clear, it is undeniably true that there were irregularities at the Bank of Asheville during its final days, including irregularities of the criminal variety. The district court has sentenced people to time in federal prison for their role in those crimes. Moreover, even where there was no criminal wrongdoing, it has become clear to the parties that Bank of Asheville's record-keeping practices could have been much better than they were. However, the Defendant's particular allegations of wrongdoing that relate to <u>this</u> case are almost entirely false. The United States will work through the Defendant's inaccuracies point-by-point, in hopes of assisting all parties in achieving a better understanding of the facts.

**Unsecured/Secured Debt:** On Page 9 of his memorandum and elsewhere, the Defendant claims that the loan at issue, loan 5487, was beneficial to Bank of Asheville because the loan "involved a refinance of pre-existing **unsecured** debt," and "put BOA in an improved and **secured** position." Doc. 36 at 9 (emphasis original). That is almost entirely incorrect. Loan 5487—the $522,000 loan for which the Defendant was applying when he made his admitted misrepresentations—did pay off the Defendant's prior loan 4212, which was an unsecured loan with a balance of $100,000, in full. Ex. 9 – Credit Analysis Memorandum. However, it also refinanced the Defendant's prior loans 4953, 5144, 5102, and 5105, which were for far greater dollar amounts, collectively totaling in excess of $2.5 million. Each one of those loans was already secured by one or more interests in real property, and the Deeds of Trust securing them were produced to the Defendant, surrounded by the relevant loan documentation, as USA_00001671, 1687, 1703, 2923, 3280, and 3884. *See* Exs. 10-15 – Deeds of Trust Securing Refinanced Loans.

Defendant's statements to the contrary are meant to suggest that Bank of Asheville exhibited some negligence, or malfeasance, in approving more than $2.5 million in prior loans to the Defendant, thus giving Bank of Asheville an independent, and potentially suspect, motive to close loan 5487, perhaps as part of an effort to conceal Bank of Asheville's past negligence with respect to the

18

Defendant from federal regulators. That would be a compelling theory, and Bank of Asheville would have been negligent, indeed, if it really had disbursed more than $2.5 million in <u>unsecured</u> debt to this Defendant. However, it did not. There is nothing improper about a bank taking additional collateral, at a customer's request, as further security for pre-existing secured debts. To the contrary, that is good business—provided the customer is not lying about the debt load attached to the additional collateral. There may have been wrongdoing at the Bank of Asheville, but this is not it.

**Automatic Payments:** The Defendant repeatedly accuses the bank of misconduct because it withdrew payments to service the pre-existing loans 4953, 5144, 5102, and 5105, from the payment reserve account established by loan 5487, the loan with respect to which the Defendant made his misrepresentations. *See*, *e.g.*, Doc. 36 at 6-7. For example, the Defendant observes, "[d]espite the absence of any written authorization permitting such actions, BOA also used [the] reserve account to make payments . . . on two other outstanding loans," referencing loans 5102 and 5105. Doc. 36 at 6. Here, too, the Defendant means to suggest that the victim was engaged in some sort of wrongdoing, but, again, the Defendant's allegations are simply false.

A "written authorization" is in the file for every refreshed loan with respect to which Bank of Asheville collected payments. *See* Exs. 16-20 – Automatic Transfer Authorizations. The authorizations are dated August 27, 2009, and August 28, 2009, contemporaneous with the close of loan 5487. One loan file has a signed copy, while the others have unsigned copies. The Defendant could make an issue of the lack of signatures, except that he acknowledges that Bank of Asheville was entitled to make automatic draws to service loan 5487, and loan 5487 is the only loan serviced by the reserve account for which the file does <u>not</u> appear to have an "Automatic Transfer Authorization." In other words, there is no principled basis for an argument that the loan 5487 draws were authorized, while the others, supported by a higher level of documentation, were not.

In truth and in fact, the reserve account was established for the service of <u>all</u> of the debts that

19

the refresher loan was meant to refresh, as evidenced by the instructions that Bank of Asheville provided to the Defendant as closing attorney, which stated, "$215,495.20 deposited into [t]he Bank of Asheville account #0120145941 established for loan payments." Ex. 21 – Closing Instructions for BoA Loan. The Defendant knows this, because the refinancing was at his request. Bank of Asheville made authorized draws to service Payne's debts, and there was nothing nefarious about it.[5]

**Depletion of Reserve Account:** The Defendant accuses Bank of Asheville of wrongfully emptying out the reserve account established by loan 5481. The Defendant claims, "BOA depleted the entire balance of the Reserve Account, which had previously totaled $215,495.20." Doc. 36 at 10. There is no evidence to support that claim. The bank deducted automatic payments for the refreshed loans on a monthly basis, as contemplated by the documents. But the real problem—the reason why the reserve account ran dry so much quicker than it should have—is because "somebody" debited $61,384.59 and $10,415.18 from the account, in two miscellaneous debit transactions, on October 7 and October 8, 2009. Ex. 29 – Reserve Account Records at 4. That was barely more than a month after the loan closed, at a time when the Defendant's loans were all current, because the automatic transfers from the reserve account were meeting his monthly obligations. There was no reason for Bank of Asheville to take that money from the account, and there is no record of the bank doing so, in marked contrast to the documentation afforded to other self-applied loan payments.

It was the Defendant's checking account, and the funds were debited, not transferred, as they were when the bank applied money to the Defendant's debts. Ex. 29. What happened to the money is clear, and was not a misappropriation by Bank of Asheville.

**Credit Analysis Memorandum:** The Defendant accuses John Hamrick of wrongdoing

---

[5]  It is also worth noting that every single loan agreement the Defendant signed at Bank of Asheville explicitly authorized the bank to collect payment of any outstanding debts of the Defendant from "any and all" of the Defendant's accounts with the bank. *See, e.g.*, Ex. 33 – Loan 5487 Business Loan Agreement at 4.

because Hamrick stated, "liabilities do not include contingent amounts in business names" in his Credit Analaysis Memorandum to the loan review committee, and because he included the financial statements of Gerald Payne and Joe Eblen in the same, actions that were allegedly "unknown to Mr. Payne." Doc. 36 at 15. This is a part of the Defendant's attempt to break the chain of causation between his misrepresentations and the loss suffered by the bank. He refers to the information in the Credit Analysis Memorandum as "Hamrick's method of supplementing Mr. Payne's loan application," and claims that "[n]one of the additional information included by Hamrick in the loan processing paperwork about Eblen or Mr. Payne's father was authorized by Payne or in any way approved of by him." Doc. 36 at 16. The Defendant's objective is to blame Hamrick, and Hamrick's purported misconduct in preparing the Credit Analysis Memorandum, for the bank's loss, thus letting the Defendant off the hook.

The Defendant's version of events is pure fiction, and he knows it.

First, the Defendant seems to imply that Hamrick's addition of a disclaimer for "contingent liabilities" suggests that Hamrick, and not the Defendant, was the one hiding the Defendant's business debts from Bank of Asheville. That is odd, because the Defendant has pleaded guilty to falsely representing, on a form that he filled out for Hamrick, that he had no such debts. Moreover, none of the debts discussed above were "contingent liabilities" in any meaningful sense of the term. In investment parlance, a "contingent liability" is a liability that *might* develop, depending upon the outcome of a future event. Pending lawsuits that might result in adverse judgments are "contingent liabilities." Pre-existing, secured, recorded debts are not. Those are just "liabilities."

Second, Hamrick included financial information on Payne's father, and on Eblen, in the Credit Analysis Memorandum because those two were borrowers/guarantors on the loans that Bank of Asheville was refinancing, on David Payne's request. When Bank of Asheville closed loan 5487, it also closed modifications to the refinanced loans, and documented them accordingly. *See* Ex. 30 –

21

Loan 5102 Modification Agreement;[6] Ex. 31 – Loan 4953 Modification Agreement; Ex. 32 – Loan

5144 Modification Agreement.   David Payne himself managed the modification closings, and David

Payne's own employee notarized the signatures of his father and Joe Eblen on the modification

agreements. *See, e.g.*, Ex. 30 at 4.   The Credit Analysis Memorandum that Hamrick prepared for the

loan review committee was intended to support the refinancing of the pre-existing loans, in addition

to the extension of new credit in loan 5487.   That is why copies of the Credit Analysis Memorandum

were attached to the modification agreements that Payne, his father, and Joe Eblen all signed.   *See,*

*e.g.*, Ex. 30 at 5-6.

In short, for David Payne, who closed the modifications to the refinanced loans, and whose

own law office obtained the signatures of Payne's father and Joe Eblen for the modifications to those

refinanced loans, to accuse John Hamrick of adding their information to the Credit Analysis

Memorandum without Payne's knowledge is utterly ridiculous.

As the foregoing non-exhaustive fact-checking exercise shows, the Defendant is engaged in a

victim-blaming exercise that is completely contrary to facts well within the Defendant's knowledge.

It is undeniably true that there were bad actors at Bank of Asheville during the relevant time period,

and that their bad acting extended, sometimes, to the loan approval process.   It is also possibly true

that John Hamrick knew, or at least could have known, that there were prior encumbrances on the

collateral Bank of Asheville intended to take to secure loan 5487, in the days leading up to close.

However, it is indisputable that the Defendant never disclosed his massive debt load associated with

the Properties, with the exception of his partial disclosure of one of the Mountain Mortgage debts.

It is indisputable that the Defendant perpetrated a similar fraud upon MFBT using the same

properties.   It is indisputable that the Defendant's raft of misconduct accusations against Bank of

---

[6]        Loan 5102 and loan 5105 were closely related and cross-collateralized; the loan 5102 modification extended the
maturity date for the collateral securing both loans, as well as established a schedule for interest payments.

Asheville in connection with his loan approval and payment process are frivolous. And it is indisputable that Hamrick, as well as everybody else at Bank of Asheville, expected that the bank would be in first position on the collateral as of the date of closing. If the Defendant contests these points at sentencing, he should not receive the benefit of an acceptance of responsibility reduction.

### B.  Issue Two:  Calculation of the Loss Amount

The second issue that divides the parties is the proper calculation of the loss amount, for purposes of the United States Sentencing Guidelines. It is not as complicated as the Defendant has made it out to be. The United States has determined the loss amount according to the instructions contained in the sentencing guidelines, consistent with case law interpreting those instructions. It is $261,000. The Defendant's arguments to the contrary—including the ones made by the Defendant's third attorney, the "expert" David Miller—are unpersuasive.

### 1.  The Loss Amount is $261,000.

United States Sentencing Guidelines Section 2B1.1 provides that persons convicted of certain enumerated offenses, including crimes of fraud and deceit, are subject to an enhancement based on the amount of the loss resulting from the offense conduct. *See generally* U.S.S.G. § 2B1.1(b)(1). The Application Notes to that section clarify that "loss" is defined as the greater of "actual loss" or "intended loss." U.S.S.G. § 2B1.1, Application Note 3(A). Generally speaking, "intended loss" is loss that an individual "purposely sought to inflict." U.S.S.G. § 2B1.1, Application Note 3(A)(ii). Through counsel, the Defendant has represented to the government that he did not intend to inflict any loss on the banks that he defrauded. The Defendant was scrambling to string together a series of short-term loans, hoping to use the Properties to secure enough liquidity to support his day-to-day operations, until he could find genuine purchasers for the Properties and some of his other development ventures. Once he found buyers, the Defendant figured, he would be able to pay off his ever-increasing indebtedness in one fell swoop.

23

As we all know by now, 2009 was the wrong year to play that game, and things did not work out the way the Defendant planned. Still, the government has no reason to doubt the veracity of the Defendant's representations that he genuinely hoped to be able to pay off the debt that he accumulated. The government therefore agrees with the Defendant that the "intended loss," for sentencing purposes, is negligible. That being the case, "actual loss" will be the higher number, and will control the Defendant's base offense level.

"Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, Application Note 3(A)(i). The notes further clarify that "reasonably foreseeable pecuniary harm" means harm that "the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense," and it does not include interest or fees. U.S.S.G. § 2B1.1, Application Note 3(A)(iv), 3(D)(i). The Defendant is right about the applicable test. It has two steps. First, the Court must calculate "actual loss." *See United States v. Mallory*, 709 F. Supp. 2d 455, 457-460 (E.D. Va. 2010). Then, the Court must apply the "credits against loss" provision, and reduce the loss "by the amount actually recovered or by the amount that is recoverable at the time of sentencing" from the initial figure. *Id.* at 458. As will be set forth below, the government's actual loss calculation is correct, and there are no "credits against loss" in this case.

### a.    The Government's Actual Loss Calculation is Correct.

While the Defendant's conduct with respect to the lenders preceding Bank of Asheville— lenders such as PCB and MFBT—is relevant conduct, the United States has determined that such conduct did not produce any losses which, in fairness, can be assessed against the Defendant. The United States detailed that aspect of its position in the Statement of Relevant Conduct, and the Defendant agrees with it. The dispute before the Court concerns the actual loss associated with Bank of Asheville loan 5487.

24

At the outset, it is important to note that it was certainly reasonably foreseeable to the Defendant, at the time that he entered into the loan, that he would never be able to pay it when it came due, at least not unless he managed to sell the collateral at an optimal price point sometime before then. In addition, it was certainly foreseeable to the Defendant, as a real estate development professional who was at that very time in dire financial straits because of a tanking real estate market for raw dirt, that he might not find his perfect buyer within the time alotted. Finally, it was certainly foreseeable to the Defendant, who was the closing attorney for the loan, that his utter failure to put the bank in the collateral position it had demanded as a precondition to extending new credit would compromise the bank's ability to recoup any value from that collateral.

Taking all of that into account, a few basic, undisputed facts serve as starting points for the loss amount calculation of the United States:

- The initial principal balance for loan 5487 was $522,000.
- Bank of Asheville drew several interest payments on loan 5487 from the reserve account referenced above, but the Defendant never made any payment, and the bank never collected one, that reduced the principal balance.
- On or about January 21, 2011, Bank of Asheville, the victim, was shut down by the FDIC.[7]

At that point, Bank of Asheville ceased to exist. Any harm Bank of Asheville would suffer as a result of the Defendant's conduct was complete, and Bank of Asheville was no longer in a position to benefit from any recovery of lost property. The task in this case, then, is a historical one. The Court must determine Bank of Asheville's losses as of January 21, 2011.

Fortunately, a transaction took place on January 21, 2011, that involved loan 5487 and that provides a useful benchmark for its value on that date. The FDIC did not "take over" Bank of Asheville on the closure date. Instead, the FDIC arranged the sale of Bank of Asheville, as a "whole bank," to First Bank, headquartered in Troy, North Carolina. The transaction was memorialized in

---

[7] Background information available at https://www.fdic.gov/bank/individual/failed/bankofasheville.html

a Purchase and Assumption Agreement,[8] which explained that First Bank would assume all of Bank of Asheville's liabilities and assets. First Bank agreed to purchase Bank of Asheville's deposits and other liabilities without a premium or discount, and to purchase Bank of Asheville's assets, including loans like loan 5487, from the FDIC with a $23,940,000 aggregate discount.[9] Because of the substantial discount on assets, in reality, it was the FDIC who paid First Bank to "purchase" Bank of Asheville, rather than the other way around. Still, that was cheaper for the FDIC than a "takeover," which would mean managing Bank of Asheville's assets, and insuring all of its deposits, without assistance.

The pricing structure for these "whole bank" acquisitions is complicated, and the idea that the FDIC would pay First Bank to acquire Bank of Asheville's total portfolio requires some explanation. For a bank, an outstanding loan, provided it retains any collectible value, is an asset. That is true even if the loan is delinquent. A loan represents the right of the bank to receive payments at a later date. On the other hand, for a bank, deposits are liabilities. Deposits represent an obligation, on the part of the bank, to pay somebody else on a later date. Typically, when a bank goes under, that means the aggregate deposits and other liabilities on the bank's balance sheet substantially outweigh the aggregate value of the loans and other assets on the bank's balance sheet. The FDIC pays the purchasers in these transactions because the purchasers are assuming a net-negative portfolio that would otherwise become the FDIC's sole responsibility; the FDIC is essentially agreeing to defray some of the purchaser's impending losses. Meanwhile, the purchasers do have the opportunity to make a profit, if they can more successfully manage the portfolio than the failed enterprise did.

So, it is true that it is an oversimplification to say that First Bank "purchased" loan 5487 at a book value of $261,000, because that term typically implies the payment of consideration, whereas

---

8          Document available at https://www.fdic.gov/bank/individual/failed/bankofasheville-p-and-a.pdf
9          *See generally* https://www.fdic.gov/bank/individual/failed/bankofasheville-bid-summary.html

First Bank was the one getting paid. However, it is an oversimplification for the sake of convenience. It is indisputable that First Bank agreed to acquire Bank of Asheville's total portfolio, and did acquire Bank of Asheville's total portfolio, at a price point that was calculated, in part, by assigning to loan 5487 a net positive value of $261,000.

Courts have wrestled with the impact of distressed loan acquisition on the actual loss calculation before. For example, in *United States v. James*, 592 F.3d 1109 (10th Cir. 2010), the Tenth Circuit was tasked with reviewing a district court's loss calculations for two sets of lenders: (1) the original lenders whom the defendant defrauded and who then sold the loans to successors, and (2) the successor lenders who foreclosed and took other actions to recoup value from the asset. With respect to the former, that court held, "most of the original lenders sold the loans to successor lenders before the foreclosure sales. Thus, the successor lenders—not the original lenders—received the proceeds from the foreclosure sales. Accordingly, to the extent any original lender sustained an actual loss, that loss is the difference between the outstanding balance on the original loan and what the lender received when it sold the loan." *James*, 592 F.3d at 1115.

Applying the logic of *James* to this case, the "actual loss" suffered by Bank of Asheville, given that no principal payment was ever made on the loan, would be the difference between the face value of the loan and the value that First Bank assigned to the loan in determining its bid to the FDIC: $261,000. For all intents and purposes, that is "the difference between the outstanding balance on the original loan and what the lender received when it sold the loan." *Id.* Moreover, this approach comports with common sense, because it is representative of the difference between the value of the asset Bank of Asheville thought it was getting, and the value of the asset it actually got. Bank of Asheville thought that it was gaining an asset worth $522,000, when it extended a loan to the Defendant based in part on his misrepresentations, and at the end of the day, when the diminished collateral status and the Defendant's inability to pay had become clear, Bank of Asheville held a

27

distressed asset valued by the successor that acquired it at $261,000.

**b.      There Are No Credits Against Loss.**

Step two of the actual loss calculation is to determine whether there are any "credits against loss," referring to the instructions contained in Application Note 3(E) to Guidelines Section 2B1.1. *Mallory*, 709 F. Supp. 2d at 458.  The United States has considered each of the three directives contained within the Application Note, and none provides a basis for reducing the loss amount.

The first directive is that loss shall be reduced by "[t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected."  U.S.S.G. § 2B1.1, Application Note 3(E)(i).  The defendant never returned any money or property, aside from some interest payments, which did not cut into the principal.

The second directive is that loss shall be reduced, "[i]n a case involving collateral pledged or otherwise provided by the defendant," by "the amount the victim has recovered at the time of sentencing from disposition of the collateral[.]"  U.S.S.G. § 2B1.1, Application Note 3(E)(ii).  The collateral has been foreclosed, and Bank of Asheville did not see a penny.

The third directive is that loss shall be reduced "in the case of a fraud involving a mortgage loan, if the collateral has not been disposed of by the time of sentencing," by "the fair market value of the collateral as of the date on which the guilt of the defendant has been established[.]"  U.S.S.G. § 2B1.1, Application Note 3(E)(iii).   Again, the collateral has been foreclosed, and Bank of Asheville did not see a penny.

The actual loss analysis is that simple.   Bank of Asheville's loss was $261,000.

**2.      The Defendant's "Expert Reports" Are Inappropriate and Unreliable.**

The Defendant outsources much of the duty of legal argument regarding loss amount to an "expert witness," David Miller.   There are a number of reasons why Mr. Miller's report would never

28

pass muster under Federal Rule of Evidence 702, but this case is on for sentencing, and the rules of evidence are relaxed. Therefore, rather than argue against the admissibility of the report, the United States will proceed through it point by point and explain why the Court should not afford his opinions significant weight. *See United States v. Wilson*, 896 F.2d 856, 857-58 (4th Cir. 1990) (indicating that a district court should only consider evidence at sentencing that comes with sufficient indicia of reliability). Mr. Miller's opinions are framed as responses to a series of questions, and the government will adopt the same framework for the following discussion. Most of what Mr. Miller has to say is irrelevant to the questions of law before the Court at sentencing, and most of his conclusions are premised on mistakes of fact. In general, Mr. Miller's "opinions" are just another exercise in victim blaming, and they are not reliable enough for Court consideration.

First, however, comes one over-arching and important critique: Nearly everything that David Miller says is categorically inappropriate, coming from an "expert" giving opinion testimony. In order to calculate the loss amount in a criminal case, the district court must first determine the meaning of the term "loss" in the sentencing guidelines, including what categories of things do and do not count as loss, and then, using those definitions, the court must do the math. The first part of that process— the part that involves determining what is and what is not loss—involves questions of law. *See, e.g.*, *United States v. Chatterji*, 46 F.3d 1336, 1340 (4th Cir. 1995) ("The definition of 'loss' is a question of law[.]"). The second part—the math—involves questions of fact. *Id.* Experts can offer the Court their opinions as to facts—things like how the math works out—but they cannot usurp the role of the Court by assuming the duty to apply the law to those facts, and to thereby reach a legal conclusion. *See, e.g.*, *United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006) ("opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible."); *A.E. v. Independent School Dist. No. 25*, 936 F.2d 472, 476 (10th Cir. 1991) (holding that an expert may not state legal conclusions drawn by applying the law to the facts); *Cargill Meat Solutions Corp. v. Premum Beef*

29

*Feeders, LLC*, 168 F. Supp. 3d 1334, 1345 (D. Kans. 2016) ("An expert may not apply the law to the specific facts of the case to form legal opinions."); *Perez v. Townsend Eng'g Co.*, 562 F. Supp. 2d 647, 652 (M.D. Pa. 2008) (holding that an expert may not state his opinion using "legal terms of art," such as "defective," "unreasonably dangerous," or "proximate cause").

To be frank, that is all Mr. Miller does, and he is not allowed to do it. For that reason alone, this Court should disregard his reports in their entirety. However, Mr. Miller's problems do not end there.

> **a.      Mr. Miller's First Question:      What Was the Collateral Liquidation Value for this Loan?**

Mr. Miller sets out, in his first offering, to determine the collateral liquidation value for loan 5487. His analysis is muddy, but Mr. Miller appears to conclude that First Bank—the successor-in-interest to Bank of Asheville—<u>could</u> have bid on the collateral at the foreclosure sale initiated by the hard-money lenders J.P. and K.J., who sold the collateral for $238,325.21 on or about June 1, 2011. *See* Doc. 36-2 at 3-4; Doc. 38-25. Mr. Miller provides a list of numbers showing that it <u>could</u> have been profitable for First Bank to make such a bid, <u>if</u> it bid enough to pay off J.P. and K.J. (whose interest in the property Defendant failed to subordinate to Bank of Asheville's, despite his duty as closing attorney to do so), and <u>if</u> it bid enough to make the Bank of Asheville whole, as well, despite the fact that Bank of Asheville no longer existed. The argument seems to be that Bank of Asheville suffered a negligible loss because, months after Bank of Asheville ceased to exist, First Bank theoretically could have better managed the collateral that secured loan 5487.

Mr. Miller's version of a collateral liquidation value analysis is not relevant to any issue before the Court. The applicable rules are well established. Where the collateral has not been liquidated prior to sentencing, then the fair market value as of the date when the defendant's guilt is established serves as a credit against the victim's loss. *See* U.S.S.G. § 2B1.1, Application Note 3(E)(iii). In

contrast, where the collateral has been liquidated prior to sentencing, then "<u>the amount the victim has</u> <u>recovered</u> at the time of sentencing from the disposition of the collateral" serves as a credit against the victim's loss. *See* U.S.S.G. § 2B1.1, Application Note 3(E)(ii) (emphasis added). Here, the collateral was liquidated prior to sentencing, so Application Note 3(E)(ii) controls. Clearly, the victim "recovered" nothing from that liquidation. The victim no longer existed, and all proceeds of the foreclosure sale went to the hard-money lenders whom the Defendant, as closing attorney, had left with a security interest senior to that of the victim, contrary to the victim's instructions. The credit against loss is "0," because that is how much the sale of the collateral benefitted the victim in this case.

What Mr. Miller is trying to do—or what the Defendant is trying to do, through Mr. Miller— is change the legal test. Rather than calculate loss according the instructions in the sentencing guidelines, the Defendant is creating a new test, one which would deduct from a victim's loss any amount that the victim—or the victim's successors-in-interest—<u>could</u> have recovered from the collateral, if their handling of that collateral had been consistent with what hindsight shows could have been more advantageous. That is problematic. The Defendant would have the Court rely on the alleged negligence of the victim (and the victim's successors) to excuse the consequences of the Defendant's fraud, a method that is plainly inconsistent with applicable law. *See, e.g., United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004) (collecting and endorsing cases holding that victim's negligence in failing to discover crime perpetrated against it is no defense to criminal conduct); *United States v. Berman*, 21 F.3d 753, 757 (7th Cir. 1994) (Posner, J.) ("[E]ven if the [victim] was negligent, it would be entitled to restitution from a deliberate wrongdoer; contributory negligence is not a defense to fraud."). The Defendant's error is compounded by the fact that the loss was suffered by Bank of Asheville, <u>not</u> by First Bank, so the Defendant is asking this Court to reduce the victim's loss because of alleged negligence on the part of <u>somebody else</u>.

To be clear, the duty the Defendant seeks to impose upon his victim and his victim's

31

successors simply does not exist. It is settled law throughout the federal courts that "whether or not [a crime victim] might have been able to mitigate its damages . . . affords the criminal perpetrator no excuse[,]" because "[a] crime victim is not required to mitigate damages." *United States v. Rice*, 38 F.3d 1536, 1542 (9th Cir. 1994). That is because "it would be improper and overreaching to require a fraud victim to pursue every possible avenue to mitigate the costs of the crime perpetrated upon them." *United States v. Fallon*, 317 Fed. Appx. 128, 131 n. 6 (3d Cir. 2008). *See also United States v. Soderling*, 970 F.2d 529, 534 (9th Cir. 2002) ("They first argue that the amount of restitution is higher than authorized by law because the district court included in its calculations losses that could have been avoided had the FDIC properly mitigated damages. However, we are unable to find any support in the VWPA or our caselaw for the proposition that the victim of a criminal offense is required to mitigate damages."); *United States v. Williams*, 292 F.3d 681, 687 n. 2 (10th Cir. 2002) (quoting *United States v. Grissom*, 44 F.3d 1507, 1515 (10th Cir.), *cert. denied*, 514 U.S. 1076 (1995)) ("[I]t is well settled restitution orders need not 'offset losses by amounts that could have been avoided through proper mitigation.'"). In short, blaming the victim will not ever—indeed, cannot ever—reduce the loss amount in this case.

> **b.** **Mr. Miller's Second Question: What Was the Value of the Loan Disbursements for this Loan, and Who Received Them?**

Mr. Miller's second "opinion" is a mess. He sets out to determine the value of the disbursements on the loan, accuses Bank of Asheville of all sorts of criminal concealment without reference to any supporting evidence, repeatedly asserts that payments that went to service the Defendant's own debt were "to the benefit of Bank of Asheville," and concludes "[i]n terms of the maximum loss as a result of David Payne, his only benefit was $97,000 and that would be the dollar amount of the actual loss." Doc. 36-2 at 5.

There are a number of problems with this approach.

For one thing, it assumes that the Defendant's gain is the appropriate measure for "actual loss," once again replacing the test set forth in the sentencing guidelines with one better suited to Defendant's needs, without any legal support.

For another, it simply assumes, for no particular reason, that payments made on the Defendant's various outstanding debts—payments which the Defendant would not otherwise have been able to make, thus subjecting considerable collateral to foreclosure—were not a "benefit" to the Defendant. That is ridiculous.

Finally, Mr. Miller repeatedly insinuates that Bank of Asheville was the real beneficiary of those payments because it had a motive to "cover up" or "prop up" bad debts. That theory makes no sense. In fact, before the Defendant defrauded Bank of Asheville into disbursing the refresher loan, Bank of Asheville was arguably entitled to foreclose on the collateral securing loans 4953, 5102, 5105, and 5144. After the Defendant defrauded the bank into issuing the refresher loan, not so much. The modification agreements for the refinanced loans provided that, in exchange for the interest-only payments that would be withdrawn from the loan 5487 reserve account over the following months, the bank would postpone the maturity dates on the deeds of trust securing the refinanced loans, with the idea being that the refinanced loans would be paid in full on the new maturity date in June 2010. Exs. 30-32. In other words, Bank of Asheville's overall position got worse as a result of the Defendant's deception, not better, as he seems to suggest.

The only non-interest payment that came out of loan 5487 was the loan 4212 payoff, which eliminated $102,195 of unsecured debt. However, even if that number were subtracted from loan 5487's $522,000 face value—and it should not be, because it was a payment for Payne's benefit, at Payne's request, on a different pre-existing debt—the result would still exceed the government's loss assessment of $261,000. Thus, Mr. Miller's purported loss calculation method, properly applied, would produce a loss amount greater than the one advocated by the government.

33

At the end of the day, none of this portion of Mr. Miller's analysis matters. The indisputable fact remains that, as of Bank of Asheville's closure, the Defendant still owed $522,000 on loan 5487, and the loan was priced at $261,000 by Bank of Asheville's acquirer. The difference between the asset Bank of Asheville thought it was getting, and the asset Bank of Asheville got, was $261,000.

### c. Mr. Miller's Third Question: From a Banking Perspective, What Was the Significance of David Payne's Failure to Disclose Other Debt in His Application?

Here, Mr. Miller takes it upon himself to determine that the Defendant's misrepresentations were not material. It is likely that his opinion was formed under the mistaken impression, communicated by the Defendant in his memorandum, that the refinanced debts were unsecured. If the bank knew the Defendant was never going to make a principal payment on loan 5487, it is unlikely the bank would have agreed to forfeit its right to foreclose on the collateral securing the refinanced loans. Moreover, Mr. Miller does not seem to have any awareness of the degree to which the Defendant understated his liabilities during the loan application process with Bank of Asheville.

### d. Mr. Miller's Fourth Question: From a Banking Perspective, at the Time the Bank of Asheville Loan Was Made, Did It Appear that Any Losses Were Likely, Even if the Loan Did Not Perform?

The relevant question is whether a loss was "reasonably foreseeable," not whether it was likely. Mr. Miller claims that it was not, because at the time he entered into the loan, the Defendant may have thought the collateral property had a sufficient value to cover all of the loans that he had attached to it. Here, Mr. Miller is attempting to shift the risk of a change in collateral value from the criminal to the victim. It is well settled that to do so is impermissible, and *Mallory*, one of the cases cited by the Defendant, explains why in great detail. There, the court determined that, "irrespective of whether defendant could have predicted the foreclosure sale value of the subject properties at the time of sentencing, he should be held to account for the banks' actual losses as he fraudulently induced them to assume the risk that the value of the homes would decrease—a risk that was ultimately realized."

34

*Mallory*, 709 F. Supp. 2d at 459. "Put another way, a defendant may not reasonably count on the expected sale value of collateral to save himself from the foreseeable consequences of his fraudulent conduct." *Id.*; s*ee also United States v. Crowe*, 735 F.3d 1229 (10th Cir. 2013).

### e. Mr. Miller's Fifth Question: Regarding Losses Suffered by First Bank.

Mr. Miller spills a great deal of ink arguing that First Bank has not suffered a loss. However, the government has never argued that First Bank suffered a loss. First Bank is entitled to an order of restitution, as will be addressed hereafter, but for different reasons. Because no party is arguing that First Bank suffered a loss, the question need not be addressed.

### f. Mr. Miller's First Set of Conclusions.

Mr. Miller's first report ends with a series of "conclusions" in which he communicates to the Court his "belief" regarding various actors' states of mind. He explains that he "believe[s] that the Bank knew that David Payne could not make the payments on the $522,000 loan when they made it, and that is why they established a payment reserve account." Doc. 36-2 at 8. Further, he "believe[s] that . . . David Payne thought, in the event of non-payment, the worst-case scenario would involve the liquidation of collateral to repay the loan in full without the potential for any losses." *Id.*

Mr. Miller is a banker, not a mind reader. This sort of testimony from an "expert" is plainly unacceptable. "The reasonableness of conduct and a party's then-existing state of mind 'are the sort of questions that [finders of fact] have been answering without expert assistance from time immemorial,' and therefore, these matters are not appropriate for expert testimony." *Trevino v. Boston Sci. Corp.*, No. 2:13-CV-01617, 2016 U.S. Dist. LEXIS 65967 at *9-10 (S.D.W. Va. May 19, 2016) (quoting *Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp. N.V.*, 14 F. Supp. 2d 391, 404 (S.D.N.Y. 1998)). The Court should afford no weight to any statement from Mr. Miller that purports to divine the state of mind of another.

### g.     Mr. Miller's Second Report (Doc. 36-3).

Mr. Miller's second report appears to re-state the exact same conclusions discussed above—with all of the same errors—but with the benefit of a handful of additional documents.   Doc. 36-3 at 1-5.   His opinions in the second report are no more reliable than the opinions discussed above, and the Court should disregard them for the same reasons.

In summary, the loss amount is $261,000.   The government has provided a reasonable, well-supported calculation to the Court that is consistent with applicable law.   The Defendant has done nothing to rebut that calculation.

### C.     Issue Three:   Restitution to First Bank

The third issue, and the final issue addressed by this memorandum, is whether or not First Bank, the successor-in-interest to Bank of Asheville, is entitled to restitution.   It is.   The Defendant seems to think that can only be true, and First Bank can only be a "victim" for restitution purposes, if First Bank itself suffered a loss.   But the Defendant is wrong.   Judge Cogburn decided as much in *United States v. Nelson*, No. 3:14-CR-24, 2015 U.S. Dist. LEXIS 156056 (W.D.N.C. Nov. 18, 2015). There, the defendant made the same argument advanced here, and the Court responded:

> [W]hile the court appreciates the argument and reading of the definition by defendant, other provisions of the MVRA and the weight of cases that the court has reviewed suggests that a successor corporation is a "victim" under the MVRA.   While the definition of victim appears constrained under 18 U.S.C. § 3663A (a)(2), MVRA goes on to provide that "[t]he order of restitution shall require that such defendant . . . return the property to the owner of the property or <u>someone designated by the owner</u> . . ." 18 U.S.C. § 3663A(b)(1)(A) (emphasis added).   By transferring its assets, Security Networks designated Monitronics as its successor as to whom all amounts due and owing to it would thereinafter be payable.

*Id.* at *3.   In other words, First Bank, as the successor-in-interest to Bank of Asheville, is a "victim" for restitution purposes because it owns Bank of Asheville's right to recovery.   Bank of Asheville's right to restitution would be $261,000, so that is what First Bank gets.

Judge Cogburn's decision in *Nelson* was not handed down in a vacuum.   He noted that his

conclusion, that a successor-in-interest is a compensable victim under the MVRA, was consistent with the weight of the case law. *Id.*, *citing United States v. Venson*, 481 F. App'x 828, 832 (4th Cir. 2012) (finding that "successor lenders are victims within the meaning of the MVRA"); *United States v. Wallace*, 451 F. App'x 523, 526 (6th Cir. 2011) (allowing restitution where the "direct victim . . . passes on its loss to a successor in interest"); *United States v. Haddock*, 50 F.3d 835, 841 (10th Cir. 1995) (holding that the bank that purchased the assets and claims of a defunct bank defrauded by the defendant was the proper recipient of restitution); *United States v. Yeung*, 672 F.3d 594, 602-03 (9th Cir. 2012) (affirming the district court's award of restitution to Deutsche Bank as the trustee of the investment trust that purchased the defaulted mortgage loans). Moreover, as Judge Cogburn observed, "under 18 U.S.C. § 3664(g)(2), a 'victim may at any time assign the victim's interest in restitution payments to the Crime Victims Fund in the Treasury without in any way impairing the obligation of the defendant to make such payments[,]'" and, "[u]nder the MVRA, the obligation of repayment simply does not end when a corporate victim ceases to exist, assigns the right to repayment to a third party, or when such right is acquired along with other assets by merger with or acquisition by another company." *Id.*

The Defendant has provided the Court with no reason to second-guess Judge Cogburn's analysis and no reason to deny First Bank its right to restitution.

## CONCLUSION

In conclusion, the United States hopes that this responsive sentencing memorandum aids the Court in framing the issues for sentencing and in reaching the correct resolution of those issues.

R. ANDREW MURRAY
UNITED STATES ATTORNEY

By: */s/ Daniel V. Bradley*
Daniel V. Bradley
Assistant United States Attorney
100 Otis St., Room 233
Asheville, North Carolina 28801
(828) 259-0644

37

(704) 344-6629
E-mail:    daniel.bradley@usdoj.gov

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 22nd day of August 2018 the foregoing **SENTENCING MEMORANDUM** was duly served upon counsel for Defendant by e-mail at the following addresses:

Peter C. Anderson
Beveridge & Diamond PC
N.C. Bar No. 18661
409 East Blvd.
Charlotte, NC 28203
Phone: (704) 372-7370
panderson@bdlaw.com

Stephen Lindsey
Lindsay Law Firm
NC Bar # 13017
46 Haywood Street, Suite 200
Phone: 828-541-6446

/s/ *Daniel V. Bradley*
Assistant United States Attorney