UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CASE NO. 1:17-CR-73 |
| | ) | |
| v. | ) | **SUPPLEMENTAL SENTENCING** |
| | ) | **MEMORANDUM** |
| DAVID R. PAYNE | ) | |
| | ) | |

**SUPPLEMENTAL SENTENCING MEMORANDUM OF THE UNITED STATES**

NOW COMES the United States of America, by and through R. Andrew Murray, United States Attorney for the Western District of North Carolina, and submits this supplemental sentencing memorandum in response to the Defendant's filing dated September 28, 2018.

**Introduction**

In its previous responsive memorandum, the United States identified three outstanding issues: (1) the Defendant's false denials of relevant conduct; (2) the proper calculation of the loss amount; and (3) the status of the restitution claim submitted by First Bank, the successor-in-interest to Bank of Asheville. In his latest filing, the Defendant appears to acknowledge that his initial brief contained inaccurate statements of fact, and even to retract a couple of them. Doc. 52 at 3-4. Moreover, he approaches the loss amount issue without excessive reliance on the improper "expert reports" that featured so prominently in his first submission. Doc. 52 at 12-17. The United States appreciates the efforts of the Defendant, because such efforts do help to narrow the issues. However, the core issues raised by the United States remain largely unadressed, and the same problems continue to infect the Defendant's presentation.

In this supplemental sentencing memorandum, the United States will briefly address the three issues that remain for resolution by the Court at the Defendant's sentencing hearing. This filing is

responsive in nature, and it will not reiterate all that was already set forth in the initial memorandum of the United States. The Defendant is still jeopardizing his acceptance of responsibility reduction by making representations to the Court that are contradicted by basic documentary evidence, and the loss amount calculation of the United States is still correct. However, recent developments may affect whether—and to what extent—the victim's successor-in-interest, First Bank, is entitled to restitution under the MVRA.

## Discussion

### A. Issue One: The Scope of Relevant Conduct/The Defendant's False Denial of Same.

In its previous responsive memorandum, the United States cautioned the Defendant that his mischaracterizations of the relevant facts jeopardized his chances at an acceptance of responsibility reduction. In response, the Defendant cries foul, accusing the United States of attempting "to expand the scope of his limited plea agreement, to require him to accept the allegations within the Bill of Indictment, and to transform the upcoming sentencing hearing into a nearly full-blown trial." Doc. 52 at 12. However, the Defendant is in a predicament entirely of his own creation. Three points help to set the record straight.

**First**, the Defendant well knows that the concept of "relevant conduct" extends far beyond his limited admissions in the factual basis document, which is what he seems to be referencing when he says the current debate goes outside of the scope of his agreement. Doc. 52 at 2, 4, 12. The factual basis document is not an exhaustive summary of the relevant conduct, rendering every other fact off limits to the Court. It says as much, in plain text: "The parties understand and agree that this Factual Basis does not necessarily represent all conduct relevant to sentencing . . . [and] [e]ither party may present to the Court additional relevant facts that do not contradict facts set forth in this Factual Basis." Doc. 20 at 1. Moreover, while they did not result in any countable loss, the

Defendant has always known that the United States considered the other charged loans to be part of the same course of conduct and common scheme or plan. That is why the Statement of Relevant Conduct, incorporated into the Presentence Investigation Report, discussed them. Doc. 27 at 8-9.

**Second**, of course the Defendant is not required to accept all of the allegations contained within the Bill of Indictment, just because he entered a plea of guilty to a single count. The United States made a point of noting, in its previous responsive memorandum, that "the Defendant is not required to volunteer any relevant conduct beyond his offense of conviction[,]" and that "[h]e is free to remain silent with respect to such matters." Doc. 41 at 3 (emphasis added). The one thing the Defendant cannot do is falsely deny relevant conduct, even where it falls outside the scope of the offense of conviction. *See* U.S.S.G. § 3E1.1, Application Note 1(A). Thus, the Defendant would never have had to address the remaining allegations in the Bill of Indictment at all, unless, for example, he needlessly attacked the remaining allegations as being "either groundless or inaccurate" in a court filing. However, that is what he chose to do. Doc. 36 at 8.

**Third**, no trial or trial-like proceeding is necessary to see that the Defendant has falsely denied relevant conduct during this presentencing process, and that he is continuing to do so. This is not a case where the parties are battling over which inferences the Court should draw from a convoluted set of facts—the sort of good-faith debate that would *not* jeopardize the acceptance of responsibility reduction. Nor is it a case where the parties are simply disagreeing about the legal implications of certain admitted facts. The Defendant has made a number of representations to the Court that are simply and plainly contrary to the evidence, as catalogued in detail in the previous responsive memorandum of the United States. In his latest filing, the Defendant continues in the same vein.

For example, the Defendant claims, in bold letters, that "**for all of the other loans—in stark contrast with the Government's characterizations—there is no evidence that David Payne ever submitted a loan application or financial statement**." Doc. 52 at 6 (emphasis original). That

is plainly incorrect. In its previous responsive memorandum, the United States discussed the financial statement that the Defendant emailed to PCB in connection with the January 2009 loan at length, and even attached the Defendant's email and financial statement as an exhibit. Doc. 41 at 7; Doc. 41-3. The United States also discussed the Defendant's submission of a false "Statement of Financial Position" to MFBT in connection with the May 2009 loan, and attached that financial statement—in addition to an updated one he provided several months later—as exhibits. Doc. 41 at 9-10; Doc. 41-7; Doc. 41-8. The Defendant's *own attachments* include a memorandum of an interview in which the MFBT loan officer reviewed and discussed the Personal Financial Statement submitted by the Defendant. Doc. 52-5 at 2.[1]

Later in his filing, attacking the propriety of Bank of Asheville's withdrawal of payments for all of the Defendant's debts from the reserve account established for that purpose, the Defendant claims, "[e]ven assuming unsigned authorizations permitted such withdrawals, the documents confirm that the Bank even permitted withdrawals for other loans where no such unsigned authorization even existed . . . (referencing regular withdrawals of $5,123.60 for loan # 5065[).]" Doc. 52 at 10. Again, that is plainly incorrect. An authorization *did* exist for loan # 5065. It was attached to the previous responsive memorandum of the United States as Exhibit 16, titled "Loan 5065 Automatic Transfer Authorization." Doc. 41-16. In baffling fashion, the Defendant also continues to ignore that "every single loan agreement the Defendant signed at Bank of Asheville explicitly authorized the bank to collect payment of <u>any</u> outstanding debts of the Defendant from 'any and all' of the Defendant's accounts with the bank." Doc. 41 at 20 n. 5; Doc. 41-33 at 4. In other words, regardless of whether the Automatic Transfer Authorizations were signed or unsigned, the original loan documents

---

[1] It is also worth noting that there is no requirement that the Defendant submitted any particular kind of document to the banks in order to be guilty of bank fraud, as charged in the Bill of Indictment, so long as he made a material misrepresentation.

themselves—for every loan—authorized Bank of Asheville to collect payments from any of his accounts. It is clear that the victim's collection of payments to service the Defendant's various debts was both heavily papered and entirely proper.

The United States is not to blame for the Defendant continuing to make plainly mistaken assertions like these, particularly with respect to the payment process for the loan underlying his conviction. The Defendant chose to make an overarching victim-blaming narrative an indispensible component of his loss amount analysis. At this point, in order to win on the loss amount issue, the Defendant feels that he needs to convince the Court that Bank of Asheville stole money from him out of the loan proceeds, by raiding the reserve account created for the service of his indebtedness, regularly and without the Defendant's knowledge or authorization. That narrative is totally contrary to the documentary evidence, because it obviously never happened. In order to argue that it did, the Defendant has therefore been required to put forward a false version of facts that fall within the scope of the relevant conduct.

If the Defendant continues on this path at sentencing, he will jeopardize his acceptance of responsibility reduction. *See* U.S.S.G. § 3E1.1, Application Note 1(A). That is not some sort of heavy-handed, or mean-spirited, tactical maneuver. It is the law. It is the Defendant's burden to earn the reduction. "[I]n order to receive a reduction under § 3E1.1 for acceptance of responsibility, the defendant must prove by a preponderance of the evidence that he has clearly recognized and affirmatively accepted personal responsibility for his criminal conduct." *United States v. Nale*, 101 F.3d 1000, 1005 (4th Cir. 1996) (citing *United States v. Myers*, 66 F.3d 1364, 1371; *United States v. Martinez*, 901 F.2d 374, 377 (4th Cir. 1990)). Victim blaming is inconsistent with the acceptance of responsibility. *See, e.g., United States v. Seidling*, 737 F.3d 1155 (7th Cir. 2013) (affirming district court's denial of acceptance of responsibility reduction where defendant's statements "avoid[ed] responsibility and actually redirect[ed] blame towards the victim"); *United States v. Lay*, 583 F.3d 436 (6th Cir. 2009)

(affirming district court's denial of acceptance of responsibility reduction where the defendant created "a situation where the defendant [was] attempting to shift all of the responsibility and the blame for his conduct to the victim[.]"); *United States v. O'Neal*, 969 F.2d 512 (7th Cir. 1992) (affirming denial of acceptance-of-responsibility deduction because "the defendant's . . . statement sought to blame the victim for the crime."). If the Defendant fails to demonstrate his acceptance of responsibility by a preponderance of the evidence, choosing instead to continue falsely accusing his victim of wrongdoing, he has nobody to blame but himself.

To be sure, there is still time for a course correction, and this first issue need not take up a great deal of time at sentencing. However, if the Defendant sticks to his current story, and if the Court therefore finds that the Defendant has pushed a false narrative on the Court, then the Defendant should not benefit from an acceptance of responsibility reduction.

**B. Issue Two: Calculation of the Loss Amount.**

The Defendant's latest filing pokes no holes in the loss amount calculation of the United States, as set forth in detail in the United States' previous responsive memorandum. Doc. 41 at 23-27. The loss is $261,000. The recommendation of the United States is firmly grounded in the sentencing guidelines, in the case law, in the facts, and in the fundamentals of mathematics. *Id.* The United States will not reproduce its analysis here.

In contrast, it is now clear that the the various proposed loss amounts recommended by the Defendant all depend on the Court accepting two premises: (1) that Bank of Asheville "improperly" handled the collateral securing the conviction loan; and (2) that Bank of Asheville's alleged improper handling of the collateral matters, for purposes of the calculation of the loss amount.

The first premise is a stretch. It is just another attempt at shifting the blame for the Defendant's fraud and its consequences to his victim, and it relies far too heavily on the benefits of hindsight. However, it ultimately does not matter, because the second premise is plainly—and

dispositively—incorrect. As the case that both parties agree establishes the "loss" test applicable to this prosecution conclusively determined, "a defendant may not reasonably count on the expected sale value of collateral to save himself from the foreseeable consequences of his fraudulent conduct." *United States v. Mallory*, 709 F. Supp. 2d 455, 459-60 (E.D. Va. 2010).

### 1. The Defendant's Allegations of Improper Conduct Are an Attempt to Shift the Blame to his Victim for the Consequences of His Fraud.

The United States has acknowledged that "there were irregularities at the Bank of Asheville during its final days, including irregularities of the criminal variety." Doc. 41 at 18. The United States has also acknowledged that "Bank of Asheville's record-keeping practices could have been much better than they were." Doc. 41 at 18. However, the United States has maintained that "the Defendant's particular allegations of wrongdoing that relate to this case are almost entirely false." Doc. 41 at 18. That observation is still an accurate one. That fact that certain officers at Bank of Asheville engaged in certain fraudulent conduct, with respect to certain *other* loans, does not excuse the fraud committed by this Defendant in this case.

The Defendant obviously disagrees. During this presentencing process, the Defendant has falsely accused his victim of a litany of misconduct with respect to Loan 5487. Doc. 36. For example, the Defendant accused Bank of Asheville of improperly including financial information for Joe Eblen, and for the Defendant's father, in the Credit Analysis Memorandum for Loan 5487. Doc. 36 at 15. However, there was nothing improper about it. The Defendant himself had requested the refinancing of certain loans for which Eblen and the Defendant's father were co-borrowers or guarantors, and his own law office obtained their signatures on the loan modification paperwork. Doc. 41 at 21-22. The Defendant also accused Bank of Asheville of entering into Loan 5487 for some furtive, unethical purpose, representing to the Court that Loan 5487 allowed Bank of Asheville to re-finance stale, unsecured debt into fresh, secured debt, to the satisfaction of regulators and to the

great benefit of the bank. Doc. 36 at 9. Of course, that was not true, either. Doc. 41 at 18-19. In his latest filing, the Defendant *continues* to accuse Bank of Asheville of stealing money from the reserve payment account created in connection with Loan 5487 to service the Defendant's other indebtedness, even though though it is clear that his accusations are false, and that such payments were duly authorized Doc. 41 at 19-20.

At this stage, however, the Defendant's primary accusation of wrongdoing is that Bank of Asheville "improperly" handled the collateral securing his fraudulent loan, in that Bank of Asheville did not foreclose at the precise moment when—according to the Defendant—hindsight shows that a sale would have maximized the collateral value. Putting aside the legal irrelevance of this accusation—which the United States will address below—the Defendant is still just shifting the blame to his victim. Bank of Asheville's confusing and diminished collateral position was a direct result of the Defendant's own fraudulent conduct. The Defendant cites the FDIC's 2011 civil complaint against the directors and officers of Bank of Asheville, which listed a series of problems with Loan 5487, as support for his accusations. Doc. 52 at 9. But the Defendant fails to mention that the FDIC's continued analysis of the circumstances around Loan 5487 led them to discover that those problems existed, in large part, because of the actions of the Defendant himself. The FDIC was one of the agencies that opened this investigation, and, as has been discussed at length during this presentencing process, the FDIC and the FBI discovered that "the [Committee Memorandum] stated an inaccurate bank lien position on the collateral" because the Defendant, as closing attorney for his own loan, did not subordinate the prior liens on the property at the time of closing, as he was repeatedly instructed to do. Doc. 41 at 14-16. Thus, for the Defendant to recite the FDIC's allegations blaming Bank of Asheville employees for these irregularities *before* the FDIC investigated and learned that the Defendant himself was at fault is, at best, misleading.

The fact is that Bank of Asheville believed it would have a first position lien, as of the closing date for Loan 5487, in the principal amount of $522,000, against a property appraised at the time for $1,168,000. Doc. 41 at 15-16. Of course, Bank of Asheville was also refinancing more than $2.5 million in previously distressed debt, at the Defendant's request, suggesting that the "breathing room" provided by the difference between Loan 5487's face value and the appraised collateral value was important. Doc. 41 at 18-19. In the event of default and foreclosure on all of Payne's debts, that "breathing room" could cover Bank of Asheville's losses on one or more refinanced loans, not just Loan 5487. Unfortunately, the Defendant, as closing attorney, did not ensure that Bank of Asheville would be in first position, even though the bank had made that an explicit requirement in all correspondence with him. Doc. 41 at 15-16.

From August 2009 until May 26, 2010, the collateral for Loan 5487 therefore carried approximately $972,000 of principal indebtedness, not counting interest, with Bank of Asheville's $522,000 in last position. Doc. 41 at 15-16. After that, it carried approximately $622,000 of principal indebtedness, with Bank of Asheville's $522,000 in last position, until Bank of Asheville closed down in January 2011. Doc. 41 at 15-16. These numbers exclude interest, but the prior encumbrances were accruing interest the whole time. For example, when the hard-money lenders who initially had a $100,000 second-position lien on the property foreclosed in March 2011, the amount due had ballooned to approximately $239,000. Moreover, throughout the same period, the appraised value of the property was taking a nosedive. The appraisal in the loan file was for over $1.1 million. By September 30, 2010, about a year later, the appraised value was down to $837,000. Doc. 52-13. By March 2011, three months after the FDIC closed Bank of Asheville, the appraised value of the collateral had plummeted to $239,000. Doc. 52-14.

Against this backdrop, the Defendant accuses Bank of Asheville of "gross negligence" for not pursuing foreclosure and sale at what Defendant argues would have been the mathematically optimal

moment in time. Doc. 52 at 14-15. The Defendant is leaning *far* too heavily on the benefit of hindsight, given the marketplace complexities (and hidden encumbrances) outlined above. Moreover, the Defendant's analysis completely ignores the other millions of dollars in indebtedness that the Defendant owed to Bank of Asheville, and how the interplay between those debts, and their associated collateral, with Loan 5487 may have affected the victim's decisionmaking process. In short, by attempting to shift the focus to Bank of Asheville's failure to foreclose at the specific point in time when a retrospective financial analysis suggests it *could* have maximized its return, the Defendant is only hoping to shift attention away from the role that *he* played in delaying and/or hindering Bank of Asheville's potential recovery by failing to put the bank in first position.

**2. A Crime Victim is Not Required to Mitigate Damages.**

Even if the Defendant's blame shifting were not so factually suspect, it would still be legally irrelevant. The Defendant's loss amount argument depends entirely on the theory that loss amount, under the guidelines, can and should be reduced by the amount that a fraud victim could have recovered, if the fraud victim had sold the collateral property at the retrospectively optimal moment in time. That is not the law. In its previous responsive memorandum, the United States cited numerous cases discussing the settled and universal rule that a fraud victim is not required to mitigate damages. Doc. 41 at 31-32. The Defendant's only rejoinder is a footnote from one of those opinions, *United States v. Soderling*, where the Ninth Circuit noted, "We hold only that the VWPA does not *require* a district court to offset losses by amounts that could have been avoided through proper mitigation. We express no opinion on whether the VWPA *permits* a district court to limit damages due to a victim's failure to mitigate properly." *Soderling*, 970 F.2d 529, 534 n.10 (9th Cir. 1992) (emphasis original). The Defendant thinks that footnote supports his argument.

There are two problems with the Defendant's theory. First, it is sometimes difficult to identify what in a written opinion is *dicta* and what is precedent. Not here. When a circuit court of

appeals say it is not deciding an issue, it is not deciding that issue. *Soderling* therefore held only that a victim was not required to mitigate damages under the Victim Witness Protection Act. *Id.* at 534 n.10. Second, the referenced citation from *Soderling* dealt with the victim's right to restitution under the then-governing restitution statutes. In this case, the parties are debating the calculation of loss amount under the sentencing guidelines. The governing text is therefore meaningfully different. The U.S.S.G. identify three types of credits against loss, s*ee* U.S.S.G. § 2B1.1, Application Note 3(E)(i)-(iii), and, as the United States has previously explained, none are applicable here. Doc. 41 at 28. Notably, the list does *not* include a reduction for "the hypothetical sale value of the collateral of the optimal point in time, determined with the benefit of hindsight." Thus, even if a restitution statute provided some support for the Defendant's position—and none do—it would not help him on the issue of guidelines loss, because the language of the guidelines is clear.

Sure enough, every time a federal court has considered arguments like this with respect to the issue of loss under the guidelines, it has concluded that a failure to mitigate affords no basis for a reduction in the loss amount. For example, in *United States v. Weir*, 47 Fed. App'x 113 (3d Cir. 2002), the Third Circuit considered a defendant's argument that his victims "negligently failed to send a representative to various foreclosure sales, which would have allowed the banks to minimize their claimed losses due to Weir's fraud." *Id.* at 116. The Third Circuit concluded, "We reject the claim and agree with the Government that the issue is the amount of the victim's actual loss, 'not the quality of the victim's efforts to mitigate the loss.'" *Id.* (citing *United States v. Kopp*, 951 F.2d 521, 531 (3d Cir. 1991)). In a similar vein, in *Mallory*, the defendant argued that the "'credit against loss' calculation should be based not on the actual amount recovered through foreclosure sales, but rather on the amount that defendant, at the time of the fraudulent acts, reasonably could have expected to be recovered from later foreclosure sales." *Mallory*, 709 F. Supp. 2d at 456. The Court disagreed,

holding, "a defendant may not reasonably count on the expected sale value of collateral to save himself from the foreseeable consequences of his fraudulent conduct." *Id.* at 459-60.

These decisions are not hard to understand. "In interpreting a guideline, ordinary rules of statutory construction apply." *United States v. Rouse*, 362 F.3d 256, 262 (4th Cir. 2004). Statutory construction starts (and ends, absent ambiguity) with the plain language of the text. *See, e.g., United States v. Smith*, 35 F.3d 344 (8th Cir. 1994) (observing "where the statute is unambiguous on its face, the language of the statute is conclusive as to legislative intent"). The guidelines tell us how to calculate loss, including how to determine credits against loss. *See* U.S.S.G. § 2B1.1, Application Note 3(E)(i)-(iii). The language is plain. The Defendant's theory seeks to add a *new* credit against loss, based on the hypothetical sale value of the collateral at an allegedly optimal moment in history, but there is no such thing in the guidelines. It is that simple.

**C. Issue Three: Restitution to First Bank.**

In its previous responsive memorandum, the United States explained why First Bank, the successor-in-interest to Bank of Asheville, was entitled to an order of restitution in Bank of Asheville's place. In short, the MVRA provides that an order of restitution "shall require that [a] defendant . . . return the property to the owner of the property or someone designated by the owner . . . ." 18 U.S.C. § 3663A(b)(1)(A) (emphasis added). This Court has previously held that a successor entity is a "designee" of the victim entity for purposes of the MVRA. *United States v. Nelson*, No. 3:14-CR-24, 2015 U.S. Dist. LEXIS 156056 (W.D.N.C. Nov. 18, 2015). Thus, First Bank was entitled to the restitution order that would have accrued to the benefit of Bank of Asheville, if it still existed.

However, on October 6, 2018, counsel for the Defendant informed the United States that the Defendant had just settled his Loan 5487 debt to First Bank, as the successor-in-interest to Bank of Asheville, out of court. First Bank had previously obtained a civil judgment against the Defendant for the full balance of the loan, plus interest and costs, and the settlement is designed to extinguish

that civil judgment. According to the terms of the Settlement Agreement, the Defendant was to pay $100,000 to First Bank on or before October 12, 2018. Additionally, as a part of the settlement, on October 9, 2018, a representative for First Bank emailed the United States Probation Officer assigned to this case, with undersigned counsel CC'ed, and withdrew First Bank's claim to restitution.

The settlement does not affect the loss amount calculation, coming, as it does, long after the detection of the offense. *See* U.S.S.G. § 2B1.1, Application Note 3(E)(i).[2] It simply has nothing to do with the seriousness of the Defendant's offense conduct, as measured by the loss amount provisions of the sentencing guidelines. *See, e.g., United States v. Shaffer*, 35 F.3d 110, 115 (4th Cir. 1994) (holding that loss amount in a bank fraud case had to be calculated at the time of detection, not the time of sentencing, and disregarding defendant's presentencing settlements with his victims, because "a reduction of sentence because of a last minute payment of restitution would unfairly discriminate in favor of those with greater financial resources."); *United States v. Schneider*, 930 F.2d 555, 559 (7th Cir. 1991) (observing that from a legal perspective, a victim's loss would not be reduced "if a pickpocket got cold feet and returned his victim's wallet before the victim discovered it had been missing"); *United States v. Mason*, 41 Fed. App'x 612, 620-21 (4th Cir. 2002) (affirming and adopting the reasoning of a district court that held a fraudster's presentence settlement with his victim could not reduce the loss amount, because a contrary result would mean "if somebody robs a bank and pays all the money back before trial or before sentencing . . . the guidelines would set the offense level for bank robbery at a zero loss."). In short, a contrary rule would mean that wealthy defendants, in fraud cases, could buy their way down the guidelines table after indictment, whereas poorer defendants would have to stay put. Such a result would defeat the purpose of the sentencing guidelines.

2 This is in contrast to the situation regarding the PCB loans referenced in the Bill of Indictment and Statement of Relevant Conduct, Doc. 27 at 9, which were resolved by way of a transfer of property with value in excess of the loan amount, after the Defendant defaulted but before the Defendant's fraud was detected and understood.

In contrast, the settlement will affect any potential restitution order. Typically, when a victim under the Mandatory Victims Restitution Act of 1996 ("MVRA") settles with a defendant, courts treat the settlement payment like any other presentence restitution payment. Courts subtract the dollars actually paid before sentencing from the total due and owing, in order to avoid a double-counting windfall to the victim, even though the fact of settlement does not eliminate the restitution obligation in its entirety, because restitution is mandatory under the MVRA. *See, e.g., United States v. Gallant*, 537 F.3d 1202 (10th Cir. 2008); *United States v. Bearden*, 274 F.3d 1031 (6th Cir. 2001). Thus, to use the present case as an example, if the Defendant paid $100,000 to First Bank before sentencing, then the restitution order to First Bank would be for $161,000, instead of $261,000.

However, this case may be different. In the vast majority of cases, a criminal cannot buy his way out of a restitution order, even when the victim is willing to accept something less than full compensation in satisfaction for the wrongs done to him or her. "[T]he purposes of criminal restitution include punishment[,]" and "[i]t would be improper to permit private parties to release criminal wrongdoers from punishment." *Bearden*, 274 F.3d at 1041 (citing *Kelly v. Robinson*, 479 U.S. 36 (1986), for the proposition that restitution ordered as part of a criminal sentence is punitive rather than compensatory in nature). "Thus, private individuals should not be allowed to thwart the penal goals of the criminal justice system by entering into releases or settlements with wrongdoers." *Id.* This is largely because restitution to victims under the MVRA—the Mandatory Victims Restitution Act of 1996—is, of course, mandatory, and even the victims themselves cannot waive it.

Here, though, First Bank is not a "victim," in the traditional sense, under the MVRA. First Bank is a victim "designee"—an entity that in effect purchased its coverage under the MVRA when it purchased all of Bank of Asheville's assets and liabilities. Payment to a "victim" is statutory, and mandatory, but a contractual designee's right to be paid in the place of that victim—at least, when dealing with a designee that purchased such status—would appear to be contractual in nature.

The United States has been unable to find any case law directly on point on this issue—the issue of whether a contractual designee under the MVRA can waive its contractual right to coverage under the statute—and takes no position at this time. However, the United States hopes that the above summary of the case law that does exist aids the Court in preparing to hear this issue at sentencing.

**Conclusion**

In conclusion, through considerable effort, the parties have succeeded in narrowing and focusing the issues that remain for resolution by the Court at sentencing. The Defendant continues to jeopardize his acceptance of responsibility reduction by leveling accusations of criminal wrongdoing against his victim that have no basis in fact, and that are contradicted by the plain language of the documentary evidence. If he continues to do so at the hearing, he should not get a reduction. The loss amount calculation provided by the United States—$261,000—is correct, and the Defendant's attacks on it all depend on two premises, one which is factually suspect and one of which is legally wrong. The restitution issue remains outstanding, but it will likely be resolved in part or in whole by the Defendant's presentencing payment of $100,000 to First Bank.

R. ANDREW MURRAY
UNITED STATES ATTORNEY

By: */s/ Daniel V. Bradley*
Daniel V. Bradley
Assistant United States Attorney
100 Otis St., Room 233
Asheville, North Carolina 28801
(828) 259-0644
(704) 344-6629
E-mail: daniel.bradley@usdoj.gov

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 15th day of October 2018 the foregoing **SUPPLEMENTAL SENTENCING MEMORANDUM** was duly served upon counsel for Defendant by ECF at the following addresses:

Peter C. Anderson
Beveridge & Diamond PC
N.C. Bar No. 18661
409 East Blvd.
Charlotte, NC 28203
Phone: (704) 372-7370
panderson@bdlaw.com

Stephen Lindsey
Lindsay Law Firm
NC Bar # 13017
46 Haywood Street, Suite 200
Phone: 828-541-6446

/s/ *Daniel V. Bradley*
Assistant United States Attorney